IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| MARK F. BERGENS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No.: _____ |
| ) | Judge: _____ |
| DIVERSE CONCEPTS, LLC, ) | |
| ISLAND AMENITIES, LLC, and ) | |
| SMOKY MOUNTAIN BLUE MOOSE, LLC, ) | **JURY DEMAND** |
| ) | |
| Defendants. ) | |

---

# COMPLAINT
---

COMES NOW, the Plaintiff, MARK F. BERGENS, who hereby sues the Defendants, DIVERSE CONCEPTS, LLC, ISLAND AMENITIES, LLC, and SMOKY MOUNTAIN BLUE MOOSE, LLC, and for cause of action would show unto this Honorable Court as follows:

1. The Plaintiff, Mark F. Bergens is a citizen and resident of Maryville, Blount County, Tennessee.

2. The Defendant, Diverse Concepts, LLC (hereinafter "Diverse Concepts"), is a for-profit limited liability corporation authorized to do business in the State of Tennessee, with its principal place of business located at 7100 Kingston Pike, STE B, Knoxville, TN 37919-5709, and may be served with process through its Registered Agent, Howard B. Jackson, located at 550 W. Main Street, STE 900, Knoxville, TN 37902-2552.

3. The Defendant, Island Amenities, LLC (hereinafter "Island Amenities") is a for-profit limited liability corporation authorized to do business in the State of Tennessee, with its principal place of business located at 7100 Kingston Pike, STE B, Knoxville, TN 37919-5709, and

and may be served with process through its Registered Agent, John G. Brock, 265 Brookview Centre Way, STE 604, Knoxville, TN 37919-4066.

4. The Defendant, Smoky Mountain Blue Moose, LLC (hereinafter "Blue Moose"), is a for-profit limited liability corporation authorized to do business in the State of Tennessee, with its principal place of business located at 7100 Kingston Pike, STE B, Knoxville, TN 37919-5709, and may be served with process through its Registered Agent, Howard L. Jackson, located at 550 W. Main Street, STE 900, Knoxville, TN 37902-2552.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit: 42 U.S.C. § 12101, *et seq.*, and pursuant to the doctrine of Supplemental Jurisdiction, 28 U.S.C. § 1367.

6. Venue is proper under the code provisions of 29 U.S.C. § 1391.

7. This action is brought pursuant to the provisions of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*.

8. At all times material hereto, the Defendants are employers engaging in an industry affecting commerce.

9. At all times material hereto, the Defendants collectively employed more than three hundred (300) employees in Tennessee at the time of Plaintiff's termination.

10. At all times material hereto, each Defendant was an employer subject to the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*.

11. At all times material hereto, each Defendant was an "employer" and "covered entity" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

12. At all times material hereto, each Defendant was an employer subject to the provisions of the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.*

13. At all times material hereto, each Defendant was an employer subject to the provisions of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

14. The Equal Employment Opportunity Commission's (hereinafter "EEOC") regulations define "impairment," in part, as:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine…. 29 C.F.R. § 1630.2(h)

15. The EEOC's regulations define "major life activities," in part, as including but not limited to:

> (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and
>
> (ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system. 29 C.F.R. § 1630.2(i)(1).

16. The Defendant, Diverse Concepts, is a management group supporting various restaurants, hotels, and retail shops, including the restaurant, Timberwood Grill, that is "owned" by Defendant Island Amenities, as well as the restaurant, Blue Moose Burgers and Wings, that is "owned" by Defendant Blue Moose, but in reality, these entities are interrelated with the same upper-level management and ownership that makes all of the decisions with respect to the hiring

3

and firing of employees, such as the Plaintiff during his employment, and are therefore collectively referred to herein as the "Defendants."

17. During his employment, Plaintiff received his paychecks from the Defendant, Island Amenities.

18. During his employment, Plaintiff reported to employees and/or agents of all the Defendants.

19. Had Plaintiff not been wrongfully terminated, as hereinafter alleged, Plaintiff would have worked as the General Manager over the restaurant, Blue Moose Burgers and Wings.

20. At all times material hereto, the Defendants were considered Plaintiff's employers due to the interrelated ownership and management structure of these entities and also because managers of the Defendants controlled and decided the terms and conditions of Plaintiff's employment.

21. As a result, at all times material hereto, the Defendants were considered the Plaintiff's joint employer and/or integrated or single employer.

22. The Plaintiff was hired by Defendants in May 2022 as an Assistant Manager of the Defendant, Timberwood Grill.

23. During Plaintiff's employment, he reported to and was supervised by the Director of Operations, Scott MacDonald.

24. As the Director of Operations, Scott MacDonald, had the authority to discipline and terminate the Plaintiff.

25. As the Director of Operations, Scott MacDonald, was an agent of the Defendants.

26. As the Director of Operations, Scott MacDonald, was an employee of Defendant Diverse Concepts.

27. As Director of Operations, Scott MacDonald reported to and was supervised by the Vice President of Operations, Paul Delahunt.

28. As the Vice President of Operations, Paul Delahunt, had the authority to discipline and terminate the Plaintiff.

29. As the Vice President of Operations, Paul Delahunt, was an agent of the Defendants.

30. As the Vice President of Operations, Paul Delahunt, was an employee of the Defendant Diverse Concepts.

31. Before he was hired by the Defendants, the Plaintiff was told that if his performance went well as Assistant Manager, then it was expected that Plaintiff would be promoted to the role of General Manager over a new restaurant, known as "Blue Moose Burgers and Wings," that was opening in Alcoa, TN.

32. During his employment, the Plaintiff performed his job duties in a satisfactory and competent manner.

33. During his employment, the Plaintiff was never written up or disciplined for any reason.

34. On August 19, 2022, Director of Operations, Scott MacDonald, formally offered the Plaintiff the position of the General Manager of the new Blue Moose Burgers and Wings restaurant location that was opening in Alcoa, TN.

35. On August 19, 2022, Plaintiff accepted the offer to become the General Manager of the new Blue Moose Burgers and Wings restaurant location that was opening in Alcoa, TN.

36. At the time Plaintiff accepted the General Manager position, he was scheduled to start training for the new role on approximately November 24, 2022.

37. On November 24, 2022, approximately, Plaintiff would receive an increase in pay, and work directly with the General Manager of the other Blue Moose Burgers and Wings location in Pigeon Forge, TN, and also start training the staff and preparing to open the new location in Alcoa, TN, in the spring of 2023.

38. Becoming a General Manager would be a promotion for the Plaintiff.

39. Becoming a General Manager would have resulted in a substantial increase in Plaintiff's overall compensation, including his salary and bonuses.

40. The opening of a new restaurant location, such as the Blue Moose Burgers and Wings location in Alcoa, TN, is a challenging endeavor that can take several months to prepare because it requires, among other tasks, hiring and training the entire restaurant staff, setting up accounts with vendors, such as for food, liquor, beer, supplies, small-wares, purchasing tables and chairs, and partnering with businesses and local schools, and, as a result, the more seasoned and high performing managers, such as the Plaintiff in this case, are selected for the task.

41. In fact, before Plaintiff was formerly offered the General Manager position, the Vice President of Operations, Paul Delahunt, told Plaintiff that Defendants had several qualified managers that wanted the General Manager position of the new Blue Moose Burgers and Wings location in Alcoa, TN, but that the decision was made to select Plaintiff.

42. Plaintiff was offered the General Manager position in August 2022 because of his knowledge, skills, prior experience, qualifications, and overall positive performance.

43. The Director of Operations, Scott MacDonald, made the decision and/or was involved in the decision-making process to offer the General Manager position to Plaintiff in August 2022.

44. The Vice President of Operations, Paul Delahunt, made the decision and/or was involved in the decision-making process to offer the General Manager position to Plaintiff in August 2022.

45. On August 22, 2022, Plaintiff had an abrupt stroke and was hospitalized for multiple days.

46. Plaintiff's stroke on August 22, 2022 was a disability and impairment within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

47. Plaintiff's stroke on August 22, 2022 was a physiological disorder or condition affecting one or more of the body systems, including the cardiovascular system, within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

48. The stroke that Plaintiff had on August 22, 2022 caused damage to his right arm and hand resulting in limited mobility.

49. The stroke that Plaintiff had on August 22, 2022 resulted in at least one disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

50. The stroke that Plaintiff had on August 22, 2022 resulted in at least one impairment within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

51. As a result of the stroke, the Plaintiff was forced to be out of work from August 22, 2022 until he returned to work on September 5, 2022.

52. Prior to Plaintiff's termination, as hereinafter alleged, the Director of Operations, Scott MacDonald, was aware of and/or had knowledge that Plaintiff had a stroke on August 22, 2022 and was hospitalized as a result thereof.

53. Prior to Plaintiff's termination, as hereinafter alleged, the Vice President of Operations, Paul Delahunt, was aware of and/or had knowledge that Plaintiff had a stroke on August 22, 2022 and was hospitalized as a result thereof.

54. Prior to Plaintiff's termination, as hereinafter alleged, the Director of Operations, Scott MacDonald, was aware of and/or had knowledge that Plaintiff was out of work due to the stroke from August 22, 2022 to September 5, 2022.

55. Prior to Plaintiff's termination, as hereinafter alleged, the Vice President of Operations, Paul Delahunt, was aware of and/or had knowledge that Plaintiff was out of work due to the stroke from August 22, 2022 to September 5, 2022.

56. After Plaintiff returned to work on September 5, 2022, Plaintiff had to temporarily wear a sling for his right arm due to having limited use and mobility in his right arm and hand that was damaged by the stroke, and this caused some difficulties when attempting to use his arm and/or hand, such as lifting, carrying, writing, doing deposits, and so forth, but Plaintiff was still able to fulfill his job duties.

57. As a result, when Plaintiff needed assistance because of the limitations that were caused by the stroke, Plaintiff requested reasonable accommodations that Defendants granted, including by allowing Plaintiff to wear a sling, modifying his work schedule and/or job duties, allowing him to have assistance from other employees, such as having managers assist with counting money and doing deposits when Plaintiff closed the store, having Plaintiff take multiple trips while serving food with the help of other employees, and having other employees assist Plaintiff to write legibly, but these accommodations did not impact Plaintiff's performance and did not impact his ability to fulfill his job duties.

58. Allowing Plaintiff to wear a sling due to his right arm and hand being damaged by the stroke was a "reasonable accommodation" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

59. Modifying Plaintiff's job duties due to his right arm and hand being damaged by the stroke, as described above, were "reasonable accommodations" within the meaning of the

8

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

60. After Plaintiff returned to work on September 5, 2022, the Defendants granted Plaintiff's requests to attend physical therapy in the attempt to regain full use of his right arm and hand that were damaged by the stroke, and the appointments for physical therapy required some adjustments to Plaintiff's work schedule, such as by allowing him to come into work later than scheduled and/or leave early.

61. Modifying Plaintiff's work schedule to allow him to attend physical therapy due to his stroke was a "reasonable accommodation" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

62. Plaintiff fully performed the functions of his job as Assistant Manager at the Timberwood Grill with the reasonable accommodations that were provided to him due to the stroke.

63. Plaintiff could have fully performed the functions of his job as General Manager of the Blue Moose Burgers and Wings restaurant with the reasonable accommodations that were provided to him due to the stroke.

64. The above-referenced reasonable accommodations provided to Plaintiff due to his stroke did not impose any "undue hardship" on Defendants within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

65. The above-referenced reasonable accommodations, if provided to Plaintiff due to his stroke in order to perform the General Manager position after his promotion went into effect, also would not have imposed any "undue hardship" on the Defendants within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

66. In fact, it is Defendants' position that it granted any and all of the reasonable accommodations requested and/or required by the Plaintiff due to the damage caused by the stroke.

67. In reality, the Defendants were able to provide the above-referenced reasonable accommodations for Plaintiff's stroke because Plaintiff was willing to work the unfavorable manager mid-shift at the Timberwood Grill, which started later in the day, thereby allowing Plaintiff to attend physical therapy in the morning, and which did not require Plaintiff to close the restaurant at the end of his shift, thereby allowing him to avoid having to count money and/or do deposits and perform similar duties required to close the restaurant.

68. Moreover, Defendants generally accommodated changes to the employees' work schedules, especially for the managers, such as, by allowing them to come into work late and/or leave early, and such changes were regularly accommodated for reasons unrelated to any disability.

69. Employers, such as Defendants, have a duty to provide reasonable accommodation(s) to employees with a disability.

70. Plaintiff's use of the above-referenced reasonable accommodations due to his stroke did not impact his job performance.

71. As Plaintiff planned to return to work from the stroke on September 5, 2022, the Director of Operations, Scott MacDonald, asserted to Plaintiff that his job was "safe" including his promotion to General Manager of the new restaurant location.

72. As Plaintiff planned to return to work from the stroke on September 5, 2022, the Director of Operations, Scott MacDonald, suggested that Plaintiff could work a limited schedule with shorter shifts to ease back into work, which the Plaintiff agreed to do.

73. However, when Plaintiff received his work schedule to return back to work, he was not given the limited schedule with shorter shifts like Director of Operations, Scott MacDonald, had previously suggested, but, instead, Plaintiff was scheduled to work the regular ten-hour manager shift like he had before the stroke.

74. After Plaintiff returned to work on September 5, 2022, he primarily worked the regular ten-hour manager shifts and successfully performed his job duties, but, from time-to-time, like Defendants' other managers, Plaintiff was permitted to come in later and/or leave earlier due to a doctor and/or physical therapy appointment.

75. After Plaintiff returned to work on September 5, 2022, he primarily worked the manager mid-shift, from 10:00 AM to 8:00 PM, or from 12:00 PM to 10:00 PM.

76. After Plaintiff returned to work on September 5, 2022, Vice President of Operations, Paul Delahunt, and Director of Operations, Scott MacDonald, among other employees, began making negative remarks about Plaintiff's stroke, including whether it would impact the opening of the new restaurant and Plaintiff's ability to do his job, and they also commented on whether Plaintiff was now susceptible to having more strokes.

77. From September 5, 2022 up until his termination, as hereinafter alleged, Plaintiff was able to fully perform the functions of his position as Assistant Manager.

78. After September 5, 2022, Plaintiff could still have fully performed the functions of his position as General Manager had he not been wrongfully terminated.

79. On October 19, 2022, Plaintiff was abruptly terminated for a trumped-up reason.

80. On October 19, 2022, Plaintiff received a call from Vice President of Operations, Paul Delahunt, and Director of Operations, Scott MacDonald, and Delahunt immediately stated that they had received a complaint from another Assistant Manager, Daniel King, about Plaintiff "digging through" King's bag and the other Assistant Manager, Kristy Biddle's purse during their shift on October 18, 2022, implying that Plaintiff had stolen and/or tried to steal from his co-workers, and Delahunt further stated that he was "questioning" whether he "trusted" Plaintiff "enough" to make him a General Manager. During this conversation, Plaintiff eventually realized that Delahunt was referring to a "joke" that King had played on Plaintiff during their prior shift

together, as hereinafter described, and Plaintiff attempted to explain what actually happened, but Delahunt refused to listen to Plaintiff's explanation or reconsider the termination.

81. Prior to his termination, the Plaintiff was never questioned or allowed to tell his side of the story before he was abruptly informed of his termination.

82. On October 18, 2022, Plaintiff was working at the Timberwood Grill with his co-Assistant Managers, Daniel King and Kristy Biddle.

83. As an Assistant Manager, Daniel King was an agent of the Defendants, and an employee of Defendants Diverse Concepts and Island Amenities.

84. As an Assistant Manager, Kristy Biddle was an agent of the Defendants, and an employee of Defendants Diverse Concepts and Island Amenities.

85. During their shifts on October 18, 2022, Daniel King was responsible for the bar in the Timberwood Grill, Kristy Biddle was responsible for the foot carts outside of the restaurant, and Plaintiff was responsible for the restaurant in general.

86. As of October 18, 2022, the Timberwood Grill restaurant was located within walking distance to the moonshine liquor distributor, Ole Smoky Tennessee Moonshine.

87. As of October 18, 2022, Assistant Manager, Daniel King, knew some of the proprietor(s) and/or supervisor(s) of the moonshine liquor distributor, Ole Smoky Tennessee Moonshine, and, in fact, would give them free alcohol to drink at the Timberwood Grill when he was supervising the bar.

88. In return, some of the proprietor(s) and/or supervisor(s) of the Ole Smoky Tennessee Moonshine would give Assistant Manager, Daniel King, free moonshine liquor whenever he would stop by the distillery location near the Timberwood Grill.

89. Prior to October 18, 2022, Assistant Manager, Daniel King, had obtained for free Ole Smokey Tennessee Moonshine liquor to give to other employees of the Timberwood Grill.

90. As a result, during their shift on October 18, 2022, Assistant Manager, Daniel King, agreed to get Plaintiff some free moonshine liquor from Ole Smoky Tennessee Moonshine, as King had done previously for employees of Timberwood Grill.

91. When Assistant Manager, Daniel King, returned from getting the free moonshine liquor for Plaintiff, King apparently decided to play a "joke" on Plaintiff.

92. More specifically, when Assistant Manager, Daniel King, returned from getting the free moonshine liquor for Plaintiff, King's "joke" was to misrepresent that he had put Plaintiff's moonshine liquor jars into the bag of the other Assistant Manager, Kristy Biddle. After King returned from the distillery, King told Plaintiff, "Yours [the moonshine liquor jars] is in Kristy's pursue" to which Plaintiff stated, "No, it is not." King responded, "Yes, it is. Go see." At this point, both Plaintiff and King were laughing, as Plaintiff asked why he would do that, and King stated that he "did not think you would mind" and that Biddle "wanted it more than you." King led Plaintiff to believe that King placed Plaintiff's moonshine liquor jars into Biddle's purse, without her knowledge, so Plaintiff went to retrieve them because he did not want Biddle to think he would do something like that. Plaintiff then walked to the office in the back of the restaurant where the manager's bags were hanging on the back of the door. Plaintiff looked into Biddle's purse, which was already slightly open, and immediately realized that it was too small to hold a jar of moonshine liquor. Plaintiff then felt King's backpack and noticed that at least one jar of moonshine liquor was in the backpack, so Plaintiff unzipped the backpack to check if the bag contained his two jars of the moonshine that King got for him, since King was apparently hiding Plaintiff's somewhere in the restaurant, and Plaintiff saw that his jars were not in King's backpack so he zipped it back up and went on with his shift. Shortly thereafter, King and Plaintiff both laughed about this as King gave Plaintiff the two jars of the moonshine liquor that King had been hiding.

93. At no time did Plaintiff steal, nor did Defendants ever accuse Plaintiff of stealing, anything from the bags of the other Assistant Managers, Kristy Biddle and Daniel King.

94. Defendants did not fire Plaintiff for stealing.

95. At all times material hereto, Plaintiff was fully aware that there were video surveillance cameras over the area where the Assistant Managers' bags were located.

96. In fact, shortly after he was hired, Plaintiff's training as a manager at Timberwood Grill specifically included learning about the surveillance cameras, including where the cameras were located, in the event the video footage needed to be reviewed.

97. Before and after Plaintiff's shift ended on October 18, 2022, Assistant Managers, Kristy Biddle and Daniel King, never confronted, questioned, or otherwise led Plaintiff to believe that he had done something wrong.

98. As of October 18, 2022, Assistant Manager, Daniel King, was aware of and/or had knowledge that Plaintiff was being promoted to the General Manager position of the new Blue Moose Burgers and Wings restaurant in Alcoa, TN.

99. As of October 18, 2022, Assistant Manager, Kristy Biddle, was aware of and/or had knowledge that Plaintiff was being promoted to be the General Manager position of the new Blue Moose Burgers and Wings restaurant in Alcoa, TN.

100. As of October 18, 2022, Assistant Managers, Daniel King and Kristy Biddle, had both been employed by Defendants for much longer than Plaintiff, and both had previously expressed interest in a becoming a General Manager at one of Defendants' restaurants.

101. On information and belief, Assistant Managers, Daniel King and Kristy Biddle, had previously applied for a General Manager position during their employment with Defendants.

102. It is not uncommon in the restaurant industry for employees to play practical jokes on each other.

103. As of October 18, 2022, the Assistant Manager, Daniel King, was a notorious prankster in the restaurant, and it was well-known that King enjoyed playing jokes and pranks while at work, which is not uncommon in the restaurant industry.

104. For example, in or around September 2022, Bar Manager, Robert Cartree, took a very large container of approximately 200 old, sticky and smelly beer bottlecaps and opened the Assistant Manager, Daniel King's backpack—the same backpack that Plaintiff was accused of going through to justify his termination—and Cartree dumped the entire container of bottlecaps into King's backpack, zipped up the backpack, and hung the backpack on the office door.

105. Plaintiff then told Cartree that King was going to be upset about Cartree dumping sticky, smelly bottlecaps into his backpack, to which Cartree responded: "He won't care. Danny [King] screws with people all the time." Cartree was ultimately correct because King laughed at Cartree's prank after King eventually discovered the beer bottlecaps in his backpack.

106. The Assistant Manager, Daniel King, never complained or expressed any concerns about beer bottlecaps being dumped into his bag without his knowledge and/or permission.

107. In addition to the above example, numerous other managers engaged in similar and/or worse conduct that the Plaintiff was accused of, but, unlike Plaintiff, these other managers were not disciplined or terminated.

108. At the time of Plaintiff's termination, he had no prior disciplines.

109. After his termination, Plaintiff complained to Director of Human Resources, Marty Armbrester, that his termination was unjustified, and that the termination was actually due to his stroke and his recovery not happening quickly enough in the eyes of management, and, in response, Armbrester told Plaintiff that he "would not comment on that" and that Plaintiff "should do what you need to do."

110. During this conversation after his termination, Plaintiff also explained to Director of Human Resources, Marty Armbrester, the situation regarding the trumped-up termination, and that other employees had engaged in far worse conduct, such as the beer bottlecaps that were dumped into Daniel King's backpack about a month before Plaintiff's termination, but Armbrester only stated that he "sympathized" with Plaintiff's situation and Armbrester further stated that he would provide a "good reference" for Plaintiff to help him get another job.

111. At all times material hereto, the Director of Human Resources, Marty Armbrester, was an agent and employee of the Defendants.

112. At all times material hereto, the Director of Human Resources, Marty Armbrester, was responsible for all human resources related functions for each of the Defendants.

113. Plaintiff's above-referenced complaint of discrimination was never investigated by the Defendants.

114. Thereafter, Plaintiff was not offered any other position with the Defendants in any of its various restaurants.

115. Vice President of Operations, Paul Delahunt, made the decision and/or was involved in the decision-making process to terminate Plaintiff.

116. Director of Operations, Scott MacDonald, made the decision and/or was involved in the decision-making process to terminate Plaintiff.

117. At the time of Plaintiff's termination, Vice President of Operations, Paul Delahunt, was aware of and/or had knowledge that Plaintiff was still in physical therapy rehabilitating his right arm and hand due to the damage caused by the stroke.

118. At the time of Plaintiff's termination, Vice President of Operations, Paul Delahunt, was aware of and/or had knowledge that Plaintiff previously requested and utilized reasonable accommodations due to the damage caused by his stroke, such as wearing a sling for his right arm

and hand, needing assistance with counting money and doing deposits, having to take multiple trips while serving food, needing other employees to assist with writing legibly, and modifying Plaintiff's work schedule and/or hours worked, so that Plaintiff could attend physical therapy for his right arm and hand.

119. At the time of Plaintiff's termination, Director of Operations, Scott MacDonald, was aware of and/or had knowledge that Plaintiff was still in physical therapy rehabilitating his right arm and hand due to the damage caused by the stroke.

120. At the time of Plaintiff's termination, Director of Operations, Scott MacDonald, was aware of and/or had knowledge that Plaintiff previously requested and utilized reasonable accommodations due to the damage caused by his stroke, such as wearing a sling for his right arm and hand, needing assistance with counting money and doing deposits, having to take multiple trips while serving food, needing other employees to assist with writing legibly, and modifying Plaintiff's work schedule and/or hours worked, so that Plaintiff could attend physical therapy for his right arm and hand.

121. Employers, such as Defendants, must not discriminate or retaliate against employees due to a disability.

122. Employers, such as Defendants, must not retaliate against employees for requesting and/or needing reasonable accommodations due to a disability.

123. Employers, such as Defendants, must conduct fair, honest, and unbiased investigations.

124. Employers, such as Defendants, must eradicate discrimination and retaliation from the workplace.

125. As a result of the Defendants' conduct as set forth herein, Plaintiff filed a timely Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission

(hereinafter "EEOC") on December 19, 2022. (Plaintiff's EEOC Charge is attached hereto as Exhibit 1).

126. Plaintiff's EEOC Charge (Exh. 1) was timely filed.

127. On information and belief, the Defendants preserved all of the video surveillance footage of the Plaintiff that was reviewed and/or allegedly relied on to justify his termination.

128. Plaintiff received a Right to Sue Notice from the EEOC, dated July 11, 2023. (EEOC Right to Sue Notice is attached as Exhibit 2).

129. This suit is timely filed within ninety (90) days of the date of receipt of the EEOC's Right to Sue Notice (at Exh. 2).

130. Plaintiff has satisfied all the procedural and administrative requirements of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq*., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*.

131. This suit is timely filed.

132. The real reason the Plaintiff was terminated was due to his disability, and/or record of impairment, and/or because he was regarded as disabled, and/or for requesting and/or using reasonable accommodations, and/or because Defendants refused to provide Plaintiff reasonable accommodations, and/or refused to engage in the interactive accommodation process in good faith, and/or in retaliation for Plaintiff needing and/or requesting reasonable accommodations in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq*., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*.

133. Defendants are responsible and liable for the discriminatory and retaliatory actions of its agents and employees under the doctrine of respondent superior and under agency principles.

134. As a direct and proximate result of the Defendants' conduct, as alleged herein, the Plaintiff sustained great and irreparable loss of tangible job benefits, including a loss of income and benefits, both past and future, and he sustained other pecuniary losses, and Plaintiff further sustained, and will continue to sustain, great emotional distress, and humiliation and embarrassment, damage to reputation and character.

135. Defendants' conduct was with malice and/or with reckless indifference to Plaintiff's federally protected rights sufficient to justify substantial punitive damages.

**WHEREFORE**, the Plaintiff prays for judgment against the Defendants, jointly and severally, and Plaintiff prays for the following relief:

1. Compensatory damages, including back pay and front pay (or in the Court's discretion, reinstatement);

2. Punitive damages;

3. Prejudgment interest;

4. Reasonable attorney's fees;

5. The costs of this action;

6. A jury to try this cause; and

7. Appropriate equitable relief, including, ordering Defendants to abide by the above-referenced statutes, and the applicable rules and regulations of the EEOC, and for management level employees to receive appropriate training.

RESPECTFULLY SUBMITTED this the 22nd day of August, 2023.

**THE BURKHALTER LAW FIRM, P.C.**

_____
David A. Burkhalter, II, TN BPR #004771

D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
Attorneys for Plaintiff
111 South Central Street
PO Box 2777
Knoxville, Tennessee 37901
(865) 524-4974