UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| MARK F. BERGENS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | 3:23-CV-00304-DCLC-DCP |
| v. | ) |  |
|  | ) |  |
| DIVERSE CONCEPTS, LLC, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**MEMORANDUM OPINION AND ORDER**

Defendants Diverse Concepts, LLC, Island Amenities, LLC, and Smoky Mountain Blue Moose, LLC (collectively, "Defendants") move for summary judgment on all claims asserted against them by Plaintiff Mark F. Bergens in the above-captioned action [Doc. 25]. The motion is fully briefed and ripe for review. For the reasons stated herein, Defendants' motion [Doc. 25] is **GRANTED**.

**I.    BACKGROUND**

Diverse Concepts, LLC is a management group that supports restaurants, hotels, retail shops, and entertainment centers [Doc. 33, ¶ 3]. Two of those restaurants are Timberwood Grill, which is owned by Defendant Island Amenities, LLC, and Blue Moose Burgers and Wings, which is owned by Defendant Smoky Mountain Blue Moose, LLC [*Id.*; *see also* Doc. 1, ¶ 16]. Plaintiff asserts that all three Defendants are "interrelated with the same upper-level management and ownership that makes all of the decisions with respect to the hiring and firing of employees" [Doc. 1, ¶ 16]. Plaintiff began working for Defendants as an assistant manager at Timberwood Grill on May 9, 2022 [Doc. 33, ¶ 6]. On August 19, 2022, Plaintiff accepted an offer from Defendants for a position as general manager at a new Alcoa, Tennessee Blue Moose location scheduled to open

1

in Spring 2023 [*Id*. at ¶¶ 9, 10]. The plan was for Plaintiff to remain in his position as assistant manager at Timberwood Grill until November 2022, when he would then transfer to the Blue Moose location in Pigeon Forge to receive general manager training and train assistant managers for the Alcoa location [*Id*. at ¶¶ 11, 12].

On August 22, 2022, however, Plaintiff suffered a stroke and could not work for approximately two weeks [*Id*. at ¶¶ 13, 15]. Although Plaintiff had yet to accrue any paid leave, Defendants paid Plaintiff during his two weeks of medical leave [*Id*. at ¶¶ 16, 17]. Plaintiff returned to work at Timberwood Grill on September 5, 2022, and was able to perform his job as assistant manager with reasonable accommodations, such as wearing a sling and working modified job duties with a flexible schedule [*Id*. at ¶¶ 20, 24–27]. As of October 13, 2022, the plan was still for Plaintiff to begin training for the general manager position at the new Blue Moose location on November 28, 2022, and to transfer to that location on January 9, 2023 [Doc. 28, pgs. 243–44].

Plaintiff's employment, however, was terminated on October 19, 2022, due to an incident that occurred on October 18, 2022. On that day, Plaintiff was scheduled to work at Timberwood Grill with fellow assistant managers Daniel King ("King") and Kristy Biddle ("Biddle") [Doc. 33, ¶ 40]. After King arrived, Plaintiff asked him to obtain moonshine for him from Ole Smoky Moonshine, where King knew the managers and would regularly obtain free or discounted moonshine [*Id*. at ¶¶ 42, 43]. Although King initially declined, he ultimately went and got two jars of moonshine [*Id*. at ¶¶ 46, 47]. Upon his return, King jokingly told Plaintiff that he put his moonshine in Biddle's bag [*Id*. at ¶ 48]. Plaintiff then went into the manager's office and checked Biddle's and King's bags for the moonshine, without their permission [*Id*. at ¶ 50, 51]. Plaintiff asserts that King, who has a reputation as the "class clown," instigated the incident and subsequently laughed about it before giving Plaintiff the moonshine [*Id*. at ¶ 50, 52].

2

King, however, stated that he was upset about the incident and "felt it was an invasion of privacy and breach of trust" [Doc. 28, pg. 141].  At the end of their shift, King told Biddle about the incident, and they decided to address the issue with Paula Perham, the General Manager of Timberwood Grill [*Id*.].  The next day, October 19, 2022, King and Biddle reported the incident to Perham [Doc. 33, ¶ 57].  Perham testified that King was "slightly aggravated" and Biddle was "very upset" so she forwarded the information to Scott MacDonald, the Director of Operations, because she felt like it was something he needed to handle [Doc. 28, pgs. 254–55].  MacDonald then passed the information on to Paul Delahunt, the Vice President of Operations [Doc. 33, ¶ 65].

After reviewing the video footage, Delahunt noted that it appeared that Plaintiff "left, to make sure the coast was clear, go back in, frisk the bags . . . and the entire time looking out to make sure that nobody was around" [Doc. 28, pg. 102].  To him, this showed "a clear lack of judgment and a lack of character" that he could not "have working in any restaurant." [*Id*.].  Plaintiff admits that he checked the hallway to make sure Biddle was out of the office "because he was concerned that King put his moonshine liquor in her purse . . . without her permission" but disputes that he was trying to hide anything [Doc. 33, ¶ 67].  Based on the video footage and the information from Perham, Delahunt decided to terminate Plaintiff unless he learned new information during a phone call with him [*Id*. at ¶¶ 75, 76].  During the call later that day, Plaintiff initially denied going through other employees' bags until Delahunt told him that he and MacDonald reviewed the video footage [*Id*. at ¶¶ 77–79].  Then, Plaintiff explained that it was just a joke [*Id*. at 80].  Because Delahunt believed Plaintiff was not credible, he terminated Plaintiff's employment on the call [*Id*. at ¶ 81].

Later that evening, Plaintiff sent MacDonald a series of texts asking him and Delahunt to reconsider the termination, admitting that he made a mistake, and apologizing [Doc. 28, pgs. 236–

3

37]. On October 20, 2022, Plaintiff sent an email to MacDonald and Delahunt again requesting that they reconsider the termination decision, explaining that he was not trying to steal anything, and admitting that he just got caught up in the joke being played on him [*Id.* at pg. 245]. Plaintiff later contacted Marty Armbrester, the Director of Human Resources, and expressed concerns that his termination was unjustified and that it was actually due to his stroke and the recovery not happening quickly enough [Doc. 32-6, pg. 73].

On December 19, 2022, Plaintiff filed a charge of discrimination against Defendants with the Tennessee Human Rights Commission ("THRC") and the Equal Employment Opportunity Commission ("EEOC") alleging that he was terminated

> due to [his] disability, [his] record of impairment, because [he] was regarded as disabled, and/or for needing and requesting reasonable accommodations and/or because the [Defendants] refused to provide [him] with a reasonable accommodation and/or refused to engage in the interactive process in good faith and/or in retaliation [for] needing and requesting reasonable accommodations, all of which is in violation of the American With Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq*.

[Doc. 1-1]. On July 11, 2023, the EEOC issued a Notice of Right to Sue [Doc. 1-2] informing Plaintiff that more than 180 days had passed since the filing of the charge and that the EEOC was terminating its processing of the charge.

On August 22, 2023, Plaintiff initiated the instant action alleging disability discrimination and retaliation pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103, *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq*. [Doc. 1, ¶ 130, 132]. Defendants now move for summary judgment on Plaintiff's claims [Doc. 25].

## II. LEGAL STANDARD

Summary judgment is proper where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed.R.Civ.P. 56(c)). The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted). A mere "scintilla of evidence" is not enough; the Court must determine whether, viewing the record in the light most favorable to the nonmoving party, a fair-minded jury could return a verdict in favor of the nonmoving party. *Id.* at 251–52; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Plaintiff asserts that he was terminated "due to his disability, and/or record of impairment, and/or because he was regarded as disabled, and/or for requesting and/or using reasonable accommodations, and/or because Defendants refused to provide Plaintiff reasonable accommodations, and/or refused to engage in the interactive accommodation process in good faith, and/or in retaliation for Plaintiff needing and/or requesting reasonable accommodations" [Doc. 1, ¶ 132]. In sum, Plaintiff asserts the following claims: (1) disability discrimination based on the alleged (a) failure to accommodate, (b) failure to engage in the interactive process, and (c) termination on the basis of disability, and (2) retaliation for requesting a reasonable accommodation. Each claim is examined in turn, beginning with the disability discrimination claims.

## A. Disability Discrimination

Pursuant to the ADA[1], employers are prohibited from discriminating "against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Discrimination in the context of the ADA can consist of adverse action taken on the basis of disability but may also arise in relation to an employee's request for reasonable accommodations. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Generally, claims premised upon an adverse employment decision are based on circumstantial evidence, in which case the *McDonnell Douglas* burden-shifting framework is employed. *Hrdlicka v. Gen. Motors*, LLC, 63 F.4th 555, 566 (6th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). In contrast, "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence . . . of discrimination" and a different test applies. *Kleiber*, 485 F.3d at 868–69.

Here, Plaintiff alleges that Defendants discriminated against him in violation of the ADA by terminating him based on his disability and in relation to his requests for reasonable accommodations. Due to the different tests, both are examined separately.

### 1. Adverse Employment Decision

As stated previously, Plaintiff's claim of disability discrimination premised on his termination is analyzed under the *McDonnell Douglas* burden-shifting framework. Under that framework, Plaintiff must first make out a prima facie case, which requires him to "demonstrate that (1) [he] has a disability, (2) [he] is otherwise qualified for the position, with or without reasonable accommodation, (3) [he] suffered an adverse employment decision, (4) [his] employer

---

[1] Plaintiff's claims under the TDA and THRA are analyzed under the same principles as the ADA claims. *See Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 (6th Cir. 2013) (TDA); *see also Broadway v. United Parcel Serv., Inc.*, 499 F. Supp. 2d 992, 997 (M.D. Tenn. 2007) (THRA).

knew or had reason to know of [his] disability, and (5) [he] was replaced or [his] position remained open." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). The parties do not dispute that Plaintiff can establish a prima facie case. Thus, the burden shifts to Defendants to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Id*. Plaintiff "must then show that the reason given by [Defendants] was actually a pretext designed to mask unlawful discrimination." *Id*.

Here, Defendants assert that they terminated Plaintiff because "he rifled through his co-workers' personal belongings without permission" [Doc. 27, pg. 15]. This is undoubtedly a legitimate, nondiscriminatory reason to terminate an employee. Plaintiff, however, alleges that the proffered reason is pretextual. "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co.*, LLC, 681 F.3d 274, 285 (6th Cir. 2012) (citation omitted). Ultimately, the plaintiff "bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *Id*. (citation omitted).

Here, Plaintiff has failed to produce sufficient evidence from which a jury could reasonably find that Defendants terminated him due to anything other than his actions of searching his coworkers' bags without their permission. First, he asserts that Defendants "grossly exaggerated the severity" of the incident because it was just a joke and, thus, was not the true motivation for his termination [Doc. 38, pgs. 26, 27]. The severity of the incident is, however, not overly exaggerated. When viewed in the simplest terms, Plaintiff looked and reached in his coworkers' personal belongings without their permission. Whether he did so because someone played a prank on him is immaterial.

7

Plaintiff also asserts that his immediate termination in light of the nature of the incident and his positive performance leading up to the incident "is akin to 'swatting a fly with a sledge hammer.'" [Doc. 38, pg. 27] (citing *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999)). Again, Plaintiff attempts to downplay the severity of his actions by referring to it as a simple joke. Plaintiff also overstates the immediacy of the termination decision, because it was not finalized until after Delahunt spoke to Plaintiff and Plaintiff denied going through the bags. Based on these undisputed facts, no reasonable juror could find that the incident, along with Plaintiff's response when questioned about it, was insufficient to warrant termination.

Next, Plaintiff states that "Defendants clearly harbored discriminatory animus due to the false belief that [he] was not capable of performing the [general manager] position because of his medical condition and accommodations" and that "Delahunt repeatedly and openly question[ed] whether [Plaintiff] could perform the [general manager] position" [Doc. 38, pg. 27]. The ADA, however, expressly permits employers to inquire as to an employee's ability to perform the essential functions of the job. *See* 42 U.S.C. § 12112(d)(4)(B). To the extent Plaintiff alleges that Defendants did not want him to take the general manager position, the evidence directly contradicts this contention. From the time Plaintiff returned to work, he continued to discuss plans for the new location with his supervisors. There is no evidence that any supervisor did not want Plaintiff to be the general manager of that location. In fact, as late as October 13, 2022, six days before Plaintiff's termination, internal documents reflected plans for Plaintiff to be the general manager of the new location. No reasonable juror could find from this evidence that Defendants terminated Plaintiff because they did not want him in the general manager position.

Plaintiff similarly argues that discriminatory remarks were made toward him after his stroke [Doc. 38, pg. 27]. Specifically, he states that Perham and other assistant managers referred

to him as an "old man" and the "one arm bandit" because he had one arm in a sling [*Id*. at pg. 28]. As an initial matter, whether other employees referred to Plaintiff as an "old man" or the "one arm bandit" is irrelevant, because their statements are not attributable to Delahunt or MacDonald. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."). And Plaintiff testified that neither Delahunt nor MacDonald ever made such remarks. Additionally, Plaintiff testified that the nickname "one arm bandit" was "funny" and he never complained about it [*Id*. at pgs. 14, 15].

Next, Plaintiff asserts that his termination was not warranted because other managers engaged in similar or worse conduct without any disciplinary action [Doc. 38, pg. 28]. "A plaintiff offering comparator evidence to demonstrate pretext must show that the comparator is similar in 'all relevant respects.'" *Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 586 (6th Cir. 2022) (citation omitted). That is, a plaintiff must show "that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012).

Plaintiff cites various instances in which other managers engaged in alleged misconduct, such as having an intimate relationship with a subordinate, struggling with weekly financial packets, playing vulgar music, discussing drug use, abruptly walking off the job, shaping food to appear as male genitals and referring to it as other employees' lunch, dumping a pan of old bottle caps into an employee's backpack, and lying [Doc. 38, pgs. 18–21]. Only one of the foregoing instances exhibits "substantially identical conduct" to Defendants' proffered reason for terminating Plaintiff—dumping a pan of old bottle caps into an employee's backpack.

9

Plaintiff contends that, on one occasion, the bar supervisor, Robert Cartree, opened King's backpack without his permission and dumped at least 80 sticky old bottle caps from the bar into it [*Id*. at pg. 21]. However, Cartree is not "similar in all relevant aspects" to Plaintiff. First, Cartree and Plaintiff held different positions with different levels of responsibility. Cartree was a bar supervisor working directly under King, the assistant manager. Plaintiff was an assistant manager who was supposed to begin training to be a general manager of a new restaurant within a month following the incident. Additionally, King did not complain or report Cartree's actions, and Perham testified that she was not aware of the incident [Doc. 28, pgs. 26, 259]. Thus, neither Delahunt nor MacDonald were notified of the incident. Accordingly, Plaintiff cannot establish pretext via the comparator theory.

Finally, Plaintiff asserts that the timing between his return to work and termination and Defendants' disregard for their progressive discipline policy also establish pretext. The Sixth Circuit, however, has made it clear that temporal proximity, alone, cannot establish pretext, *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012), and "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (citations omitted). Nevertheless, the termination occurred almost two months after Plaintiff's stroke, during which time Defendants paid Plaintiff two weeks of leave despite not qualifying for the benefit, provided various accommodations, and continued discussing his transfer to the new Blue Moose location as general manager. And Defendants' Disciplinary Action Policy provides that "Timberwood Grill reserves that right to terminate an employee at any time for any reason without prior disciplinary counseling or notice." [Doc. 39-1, pg. 101]. Based on the foregoing, Plaintiff has failed to create a genuine issue of fact as to whether Defendants' proffered reason for

10

terminating him was actually a pretext designed to mask unlawful discrimination. Accordingly, the Court turns to his claims that Defendants discriminated against him in relation to his requests for reasonable accommodations

### 2. Reasonable Accommodation

Under the ADA, employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]" 42 U.S.C. § 12112(b)(5)(A). Additionally, "once an employee requests an accommodation, the employer has a duty to engage in an interactive process . . to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1232 (6th Cir. 2022) (citations omitted). "[F]ailure to engage in the interactive process . . . an independent violation of the ADA" but only "if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).

> To establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) his employer knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation.

*Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 350 (6th Cir. 2015). Here, Plaintiff alleges that Defendants refused to provide reasonable accommodations and refused to engage in the interactive process in good faith [Doc. 1, ¶ ]. However, Plaintiff alleges in his Complaint that:

> when Plaintiff needed assistance because of the limitations that were caused by the stroke, Plaintiff requested reasonable accommodations that Defendants granted, including by allowing Plaintiff to wear a sling, modifying his work schedule and/or job duties, allowing him to have assistance from other employees, such as having

11

Case 3:23-cv-00304-DCLC-DCP Document 61 Filed 02/03/25 Page 11 of 13 PageID #: 1776

> managers assist with counting money and doing deposits when Plaintiff closed the store, having Plaintiff take multiple trips while serving food with the help of other employees, and having other employees assist Plaintiff to write legibly

[Doc. 1, ¶ 57]. Moreover, he testified during his deposition that there were no accommodations that he requested that Defendants did not provide [Doc. 28, pg. 15]. Accordingly, Plaintiff cannot establish a prima facie case for failure to accommodate because, by his own admission, Defendants did not fail to provide any requested accommodations. For the same reasons, his claim that Defendants failed to engage in the interactive process fails.

### B. Retaliation

Similar to claims of discrimination premised on adverse employment action, "[r]etaliation claims are also analyzed under the *McDonnell Douglas* framework where, as here, there is no direct evidence of retaliation." *Williams*, 847 F.3d at 396. Accordingly, "[t]o make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) [he] engaged in protected activity under the ADA, (2) [his] employer was aware of that activity, (3) [he] suffered an adverse employment action, and (4) a "causal connection" existed between the protected activity and the adverse action." *Id*. If the plaintiff establishes the foregoing, "then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id*. "The plaintiff must then show that the reason given by the employer was actually a pretext designed to mask retaliation." *Id*.

Here, Plaintiff asserts that he was terminated in retaliation for needing and/or requesting reasonable accommodations. It is undisputed that Plaintiff engaged in protected activity under the ADA by requesting a reasonable accommodation, that Defendants were aware of his requests for accommodations, and that he suffered an adverse employment action, *i.e.*, termination. But Plaintiff cannot establish a causal connection between the requests for accommodation and his

12

termination, because the basis of his termination was not connected to any request for accommodatoin. Even assuming he could establish a prima facie case of retaliation, for the same reasons stated above with respect to Plaintiff's discrimination claim, Defendants have demonstrated a legitimate, nondiscriminatory reason for terminating Plaintiff and Plaintiff has presented insufficient evidence of pretext.[2] Thus, Plaintiff's claim for retaliation fails to the same extent as his claim of discrimination.

## IV. CONCLUSION

For the reasons stated herein, no reasonable juror could find in favor of Plaintiff on his claims of disability discrimination and retaliation. Accordingly, Defendants' Motion for Summary Judgment [Doc. 25] is **GRANTED**. A separate judgment shall enter.

**SO ORDERED:**

s/Clifton L. Corker
United States District Judge

---

[2] Plaintiff makes the same argument in support of pretext for both his discrimination and retaliation claims [*See* Doc. 38, pgs. 25–30].